Good morning, Your Honors. Michael Purcell for the Appellant and Defendant, Telecom Italia Sparkle of North America, also known as TISTA. May it please the Court, I would like to address three specific areas that we believe there was a serious error of law that affected Telecom Italia's substantial rights. The first relates to the Court's denial of the Rule 50 motions that TISTA made in trial and after trial related to the plaintiff's claim for a multiplier or accelerator pursuant to the contract between the parties. The second relates to the expert chart that the Court admitted into evidence over TISTA's objection. And the third relates to the readback that was ordered by the Court of a single witness's testimony. I'd also like to reserve three minutes at the end for rebuttal. Turning to the first issue relating to the Rule 50 denial of TISTA's motion for a judgment as a matter of law regarding the multiplier or accelerator claim. The parties entered into a written contract, and there's no dispute that this contract was agreed to. It was submitted by both parties as evidence in the case. The contract had clear terms about the compensation that Mr. Monaghan was entitled to. Mr. Monaghan received $100,000 a year in base pay, and then he was also entitled to a certain level of variable compensation provided that he met certain quotas. The contract also said that he was entitled to no accelerator. It had a specific term. May I ask you a question? Yes. Was there evidence in the record that Mr. Monaghan testified that he went to several meetings at which an offer was made that if he sold a certain amount or anybody did, accelerator would apply? And the reason I ask that is because we have some cases in California that an executed written agreement can be modified by an executed oral modification. Now, why is what Mr. Monaghan testified to not sufficient as against a Rule 50 motion? Yes, Your Honor. To raise a tribal issue of fact as to whether there was indeed an executed modification of the no accelerator clause. Your Honor, I do not believe that there was evidence that he was given an offer. And I think the terms used by both Mr. Monaghan and in the appellee briefs indicates that. What was discussed in the brief by Mr. Monaghan was a series of what he terms presentations, one of which was a time that he was at a meeting with the entire staff of the office. About five out of the 30 employees were salespeople. Well, we know from first-year contracts that offers of rewards made out to the public are offers. Why is it not an offer if it's made to more than one person? Your Honor, because it was not directed to him. There was no testimony that it was directed to him specifically. If the boss says if anyone here sells over 120 percent of their quota, they'll be an accelerator. Right? And anyone here. But there was no testimony that it was anyone here. There was testimony that it was presented. Also, at trial, Mr. Monaghan was asked specifically, was there any amendment to the contract that said that you were entitled to an accelerator? And his response was there was no executed amendment. There was no testimony at any time that he was ever presented with an offer that he accepted that said he was entitled to an accelerator. In fact, he testified in the exact opposite fashion. When asked whether there was an offer that he would be permitted to receive or allowed to receive the accelerator, he said, no, there was not. What was the citation of the record on that? That was, I'll find it quickly here. It was quoted in our reply brief, and I'll find you the reference to it. But the terms he used were, it's ER-230. And Mr. Monaghan was questioned, if there's any agreement that says you're entitled to an accelerator, his response was no executed amendment, sir. And then he was asked, and there is a contract that says you're not entitled to an accelerator. And he said, correct, sir. The other ---- So that might conflict with his claim that he heard words that said anyone here who brings in over 120 percent gets an accelerator, which was an offer for a unilateral contract. Yes, Your Honor. Yes. What do we do with that? If a witness testifies on both sides of an issue and he's a plaintiff, do we take the admission that there is no executed amendment and strike the testimony that he heard there was an offer and that he accepted it? Well, I think first, Your Honor, that he does not actually say there was an offer. He says it was presented. And it was ---- there was testimony that was not contradicted, that there were many people in that meeting who were not salespeople, who had no role in sales. In fact, it was a small minority. It was less than a sixth of the people who actually were salespeople. There was also uncontradicted testimony that Mr. Monaghan's contract was a very different contract than any other of the salespeople operated under. He had an eligibility for a much more substantial variable pay, but then was not entitled to any increase of that through a multiplier or accelerator, whereas the other salespeople had a much smaller maximum compensation level for their variable compensation that then could be subject to an accelerator, subject to a variety of other factors. And none of that was ever ---- there's no contradiction to that. We also turn back to the contract itself, which says that there is in the contract that there are no oral modifications of the contract permitted. Additionally, the practices of the parties indicates that they understood that and proceeded under that assumption because there is testimony that is not disputed by either party that the parties did amend the contract twice, but both times that it was amended, it was amended in writing and executed by both parties. So I do not believe that given the express written contract between the parties and the nature of the testimony, including Mr. Monaghan's admission, that he did not make an oral modification. He only claims that he was presented on various occasions and never says that he was presented individually or told, if you exceed this, that you will then receive the multiplier. And I believe that ---- So why should we think this made any difference? Because what the jury wound up doing seemed to track ---- well, you complain elsewhere and will get to, I assume, the page from the expert report, but the numbers that match are the numbers from the no accelerator column. And that is true on some of the claims, Your Honor. But it only relates to the post-termination claims. And there is another claim which relates to the unpaid wages claim. And that unpaid wages claim does not relate to any activity after termination, but it was wages that were allegedly due to Mr. Monaghan at the time of termination and then under California which are obligated to be paid within a certain days of termination. And Mr. Monaghan made a claim there, presented expert testimony, and as the Court says in its order that there is ---- that number that Mr. Monaghan was awarded by the jury for unpaid wages and penalties, the pre-termination claim essentially, was the no multiplier section was less than half of what the jury awarded. And what's significant about that is, one, the jury could quite reasonably have decided that Mr. Monaghan had not shown that he was entitled to the variable pay following his termination, but could have decided that he was entitled to the variable pay pre-termination. And I don't think there's a dispute. Why? Because he had a record of meeting that performance level. And as both Mr. Monaghan's expert witness and Mr. Monaghan testified, the quota level, the multiplier is set at 120 percent of his quota. And there was testimony that he had exceeded that 120 percent while he was performing services for TISNA. There was no testimony that or no evidence, because he was not any longer selling products for TISNA, that he had reached that post-termination. Now, the jury might have inferred that he could, but it's also I think the fact that the jury awarded him double his claim for the accelerator or for the past due wages, the only source of that, that those sums could be the accelerator. And I think that. When you take a look at the, at the summary, there was a bit of evidence and you take a look at the numbers that with the accelerator, you come to $278,358, which doesn't tally with the 335,000 that the jury awarded him. You're correct, Your Honor. And in fact, what they awarded exceeded that. But that's another issue to be discussed. Yes. And I think the other issue that is pertinent there is that the jury, in the verdict form that was returned, could have provided non-economic damages to Mr. Monaghan. And it did not. Zero. There was zero. So there's reason to believe that the jury viewed this as a purely economic damages case. And not only is the past due wages claim, the pre-termination wages claim a purely economic claim, but there is no basis for which, you know, non-economic damages could have been applied there. Now, I cannot give you a clear answer as to why it came to $270,000, as opposed to the 335,000 the jury arrived at. But I also do not believe the court's reasoning that it was double the claim plus 5,000 provides any clearer, you know, understanding as to how the jury arrived at the figures. I think what is clear is the jury awarded him much more than he was entitled to receive under the contract. What are we to do so far as you're concerned? Well, I think, Your Honor, that the Rule 50 motion should have been granted at trial. It should have been granted post-trial. There was no way for a reasonable juror to conclude that he was entitled to this accelerator. I do believe that because of that, the TISNA, that is a reversible error. I think they were substantially affected by that, and they should be entitled to a new trial because of that. On the issue of damages? Well, I think on the issue of damages as it pertains to the accelerator specifically, I don't know how, whether it would be possible for the court to only try this case as a damages case. I do think there's also an effect that having this decided that way at trial could have on the jury's evaluation of the claims. TISNA's defense was essentially that Mr. Monahan was terminated for constant complaints about his compensation. The jury didn't believe that. Why should it be tried again? Well, they may not have believed it. They may have believed differently if that had been decided. Why should it be tried again? Well, on this issue alone, I think you're correct that the damage issue alone is what's affected here. All right. If Your Honors have any other questions on that, I'm happy to answer them, or I could move on quickly to some other issues. I didn't move them. Try to hit another issue. What else do you think is important? Okay. Your Honor, I would next like to briefly return to the expert chart that was admitted by the district court over TISNA's objection. The objection was only on the grounds of hearsay. It was not on the grounds of the chart being cumulative of the evidence given by the expert or that the chart, when admitted, would provide undue emphasis to the expert's opinion. It was not objected to on the grounds of Section 403 of the Federal Rules of Evidence, that though probative, it was prejudicial. So it was not hearsay, was it? I believe it was. The chart was on the wall in front of the jury. He was examined on direct examination as to everything the chart said. He was examined on cross-examination as to everything the chart said. What remained that was hearsay? What was an out-of-court statement presented to prove the truth of the assertion when everything that the chart said was examined in front of the jury? Your Honor, I think that the chart was hearsay in the sense, you're correct that we did not object to that. It was hearsay until he was examined about every element of it. This circuit in one of the cases cited by the defendants addresses this issue and makes the distinction between what they term pedagogical tools, where charts or things are used as part of the presentation, as opposed to being admitted into evidence and received by the jury. Right. And you had a purpose. It was all in evidence through his testimony. There was nothing different, was there? Well, I do think that's true. Those numbers were put into evidence by his testimony. Yes, Your Honor. So it's already there. Well, the numbers are, but I believe that the court itself acknowledged that the document was hearsay. And then the court later, without changing its ruling on that,  to the jury. And I don't believe that once the court has acknowledged this hearsay. Well, it was hearsay until all the evidence was given by the witness as to the content of the statement. Then it was the hearsay element of it, which was the inability to cross-examine the declarant, is removed. Okay. Your Honor, I. Try another issue. Okay. Thank you, Your Honor. If we could finally turn quickly to the issue of the readback. At trial, the court ordered the testimony of one of the witnesses read back. This was pursuant to a request from the jury. The jury actually requested that one of the three witnesses from Tisna's deposition testimony be read. Not quite. The jury requested Mr. Shupa's testimony, including his deposition. What was read back was the entire Shupa's testimony, which included some cross-examination from his deposition. Why was not the judge's interpretation of the jury's request reasonable? Well, I think that the – I don't think that the court – that they asked at any point for any of his deposition testimony itself. In fact, the court directed the jury that they could not have his deposition testimony. The jury's note requested, quote, Shupa's testimony about Tisna's misclassification of Monahan. The note then clarified that the jury wanted Shupa's deposition testimony. Right? I don't think that the jury note itself asked that what they wanted were – Mr. Monahan should be a W-2 employee, question mark. What we are requesting is Mr. Shupa's deposition on this matter. That's the note. And I think that note, and I think that the parties were all at trial when this was discussed, understanding that the jury – what the jury was asking was for deposition testimony. And the Court's comments to the jury were you're not entitled to the deposition testimony. Except the portion of the deposition which were read into evidence in cross-examination. Yes. They could be entitled to that. And I think that the issue, though, when you turn to the readback, is what – you know, how does the Court safeguard against the undue emphasis? And I understand that this was – You asked for a series of mitigating instructions, all of which were given. Well, we asked for instructions. We also asked that the other testimony on that point from another witness be admitted. The Court's response was, well, they did not ask for that, but, you know, it is our understanding that they did not ask for the deposition testimony itself. Unless the – your Honors have other questions, I'll reserve my last minute for rebuttal. You may. We'll hear from the plaintiff. Good morning, Your Honors. And may it please the Court, Brian Heffelfinger, Straus and Palais, firm for the plaintiff and the appellee in this matter. I'd like to respond to the focused inquiry that my colleague has drawn attention to, and I'm happy to answer any further questions. On the issue of the Rule 50 motion and this accelerator or multiplier, I think your Honors have correctly identified that there was evidence, adduced at trial, that Monaghan was told he would receive this accelerator, that the presentation and the representations of the company was that all salesmen were eligible for the accelerator. What do we do with the quotation of a testimony that there was no executed modification? The fact that there was no executed amendment is not controlling because it was established at trial that he was misclassified as an independent contractor. In other words, he should have been treated as an employee. And so the fact that due to their illegal conduct as the predicate he didn't receive in contractual written terms, this multiplier does not they don't get to profit from that wrongful action. Whether he's a contractor or whether he's an employee, the question is, does he think he's going to get an accelerator when he gets 120 percent of his sales? And the question is put to him, was your agreement modified? And he says, no, it wasn't. Now, doesn't that cut against the idea that the presentation was an offer for a unilateral contract and he performed it? Certainly, Your Honor, the testimony goes to the question to be resolved. But I don't think that this ---- And if the written agreement does, as Mr. Purcell states, I think he's correct, have a phrase in it saying that any oral modifications are ineffective and all modifications have to be in writing. Doesn't that end the question? I don't think it does, Your Honor, where there's an illegal contract. This contract is pervaded with illegality because it had misclassified. How do you connect up the classification to the terms? If anything, it seems to me it would point the other direction. If he was being treated as an independent contractor, he's not receiving some of the benefits that employees get. You don't expect the terms to become more generous to him by being reclassified as an employee. I just don't understand the logic of why being called an independent contractor instead of an employee meant the terms of the deal change. Our position, Your Honor, is we respectfully disagree. We think that ---- Why? We think that the protections that are extended to employees are greater than those extended to employees. Does California law provide for an accelerator for all employees? No, it does not. Okay, so how does that protection affect the terms of the deal? Because he was entitled to the benefits that the employment relationship would have provided, such as the accelerator is but one piece of that. The other pieces which were awarded through the trial and through the summary judgment included the FICA contributions, the other perquisites of employment. So it's ---- Which is why I say, if anything, the movement from independent contractor to employee should push in the other direction with regard to the terms that were explicitly agreed to. The employer was likely to be more generous if it thought it wasn't going to have to make those other contributions on the employee's behalf. I simply don't understand why we should read into the contract an accelerator simply because the contract was written as an independent contractor relationship rather than an employment contract. There's no logic in that. It's a fair question, Your Honor, and I think that goes to the weight and for the jury to consider. But going to the second point of the analysis, I'm not sure that it ends up mattering because there was no prejudice since it wasn't awarded by the jury anyway, as the district court went into in detail. Which gets to the big question that's lurking out there. And although it's not directly attacked by telecom, it makes me wonder, where did that jury award number come from? I mean, some numbers you can trace exactly, and then there's a number that I can't explain. What's the explanation for that number? Well, the district court in the excerpts of record, I believe this is at page 11, came to the conclusion that the multiplier was not awarded. The district court assumed. As to the wrongful termination and future losses. Correct. But the only way that you can get close to $335,000 based on your expert's figures on the left-hand side of the summary that says penalties and earnings value, including commissions multiplier for exceeding 120% of quota. And if you take the $77,000, the $192,000, and the $8,000, you come to $278,000, which is close, well, $50,000 to the $335,000. But what other evidence is there that you can point to that comes close to $335,000? Because if they didn't award the multiplier, you've got $70,000 and $98,000, that's $168,000, plus $8,000, $176,000, and they award $335,000. You think that there's any evidence that they should award $178,000 times 2? Your Honors, there's no evidence in the record one way or the other, but I think it is... Well, if there's no evidence one way or the other, then the award of the jury is infirm. I'm sorry, I misspoke. There's no evidence to suggest that the logic the jury applied was improper, nor was there any argument by the appellant of how they should have crunched these numbers. And so the district court, if you continue in the opinion... Does it surprise you that the defendant doesn't argue that some portion of the plaintiff's economist number should be taken? It's a little surprising, Your Honor, that at this phase, they have not suggested what the jury did wrong and how they should have found if there was no... Well, they have suggested it. There's no evidence upon which the jury could arrive at $335,000, other than taking the $178,000 and multiplying by 2. The district court, Judge Collins, surmised that that was the logic. And following in the opinion, I think it's very important... And let's grant... I have all the respect in the world for Judge Collins. Let's grant that she's right. What is the evidence that allows a jury to find that the damages of the plaintiff's expert, we're going to accept it at $178,000, and we're going to bump it by multiplying by 2? Because in the column, Your Honor, there are several... And let me grab the... In the column with no multiplier... Well, it can't be because of the value of the present value of the residual commissions at term because if we give any credence to the residual commissions claim, we're double-counting because the jury verdict gave him loss of future earnings. You can't get both residual commissions and loss of future earnings. So don't go there. And, Your Honor, you are looking at the $565,000 figure? Right. Okay. So looking at that column, as the judge surmised it... And I'll get her opinion here, and this is at the excerpts of record at 11. And I think this is the key point, where at excerpts of 11 at line 12, where she states, it's clear the jury did not apply a commission multiplier to the damages for wrongful termination. I think we all agree on that. And the logical inference is that they did the same thing with damages due to misclassification. That is, they did not apply a commission multiplier. Certainly, defendant is not presenting any interpretation of the special verdict form that suggests the jury applied the commission multiplier to either claim. And so that's where it sits in this appeal. How do we explain the $335,000? It appears to be that the jury awarded the amount stated in the non-multiplier column doubled and rounded to the nearest $5,000. And there's nothing presented in the appellant's moving papers to suggest contrary. Why didn't the jury award damages based on what that day's lotto number was? We'd be just as based in the evidence as your surmise. Where do they get the number 2 as a multiplier? Do we just tell juries, here's the evidence, and if you want to multiply by 2 or multiply by 4, well, go ahead? No, that's not what we would tell juries. Well, of course we wouldn't. Is the jury award supported by the evidence? We believe so, Your Honor. And what evidence supports the $335,000 part of the award? We believe the testimony of Dr. Oxtolkhanis, which she also supplied the summary chart. And although it's not immediately clear how they did their math, we think that the chart provides ample evidence to support the award for the misclassification. Now, moving on to the other, unless there are further questions on this issue, I'd like to address with the remaining time the other items that counsel mentioned, and that is as to the, and certainly, again, final point is we don't think they've met their burden to show prejudice. As Mr. Purcell stated, I cannot give you a clear answer, and certainly the statement no reasonable jury could find for a multiplier is somewhat moot when they didn't. Turning now to this chart, I think Your Honors have correctly identified that it was no longer. I'm going to stop you again there. Yes. The times 2 part, where does that come from? Isn't that a multiplier of some kind? I mean, if your logical explanation or STAB, I grant it, we're all reading tea leaves here, but I sort of can't help myself. It seems to me I can't fathom what the logic would have been for there unless that's a backhanded way of getting to a multiplier, so. Your Honor, it may have been embedded in that residual commissions which we already discussed in terms of being reduced to present value. Then that would be double counting because you've got on the jury form compensation for future loss of income. It could theoretically be double counting, but given the figures on the. Theoretically it can't be anything but double counting. I respectfully don't agree because going to the second box for the wrongful termination damages, there's no evidence, for example, that the jury didn't shift monies from that. In other words, not double count when they awarded the other amounts. So I think we are in a space where it's ambiguous precisely how the jury walked through the process. But again, falling back to it being the appellant's burden to show that an error occurred, they just haven't met it, nor have they shown prejudice. For example, substantially higher amounts could have been awarded. So. You mean they could have used a multiplier by 3? No, as to the wrongful termination. For example, the categories for 3-year, 5-year, or never recovering. These other items, in other words, there were much larger numbers on the chart. Now turning to this chart and the arguments of hearsay, I think you have correctly identified that it no longer became evidence. It no longer was hearsay once addressed by the extensive testimony. There are literally thousands of lines of the transcript. We've provided that. It's approximately 70 pages of our supplemental excerpts at 21 to 91. And so certainly the content of the chart was in the testimony. There's been no argument that the chart inaccurately summarized her testimony. And so unless there are further questions on that, we'll move along to the readback issue. And on this, we would simply say that the appellant's characterization that the note only sought deposition testimony is simply inaccurate. In fact, perhaps there was confusion as to the proper legal parlance for the trial testimony. But the judge addressed this in open court and with the jury. She told them that they can't have the deposition. That's not evidence. And then went on to order the readback with the Newhoff admonition prior to and after the readback. So certainly there was no prejudice, especially where in the Newhoff case, under those facts, there was a readback. There was not a proper admonition. And the jury came back, I think, nine minutes later with a verdict. And in that case, they still found no prejudice. This case isn't even a close call, in our opinion, on the readback. And so unless Your Honors have any further questions about any particular pieces of the appeal, I'll turn it over to my colleague. Well, although it's of truly minor importance in the scheme of things, I'm puzzled by the summary judgment on the canvas bonus, the conversion of euros to dollars. How wasn't there a genuine dispute of fact with regard to whether the obligation was supposed to be in dollars or euros? The only admissible evidence on this canvas bonus of 7,100 euro was the testimony of Tizna's officers, this is Robert Migliozzi and Joseph Rubino, that Monaghan was entitled to be paid a bonus equivalent to 7,100 euro, but paid in U.S. dollars. Well, I mean, I read that testimony. They were being given information and asked to state their understanding based on that. I didn't see testimony that said the deal was supposed to be in euros, period. The amount was to be calculated in euros, and then there is testimony that says that. What testimony from a defendant executive said that his understanding of the deal based on the deal, not based on something he'd been told or was put in front of him, was that the deal was in euros? This would be Joseph Rubino, and this is at the supplemental excerpts at 145 and 146. He testified that Monaghan was entitled to be paid a canvas bonus equivalent of 7,100 euro based on the appropriate conversion to U.S. dollars at the time it was paid. In addition, there's a written signed contract. Well, wait, stop. So I've now made my way to page 145, and I see a question that's underlined in the copy here. I think this is part of the record. So is it your understanding of this document? And I read that, and I think that's what I read before. That doesn't mean he's testifying based on what he knows of the deal. He's testifying based on the understanding of the document that's been put in front of him. Is that correct? Because that's not the question I asked. I asked about somebody who knew about the deal. Right. Well, let's turn to the document, because the document also is the only admission. So is there any testimony from anybody about who knows about the deal? I mean, your brief argues this is a judicial admission, which it's not. I'm waiting to find evidence that says it's conclusive, it's unquestionably a deal for euros. And I haven't found it. The canvas bonus contract is at supplemental excerpts 156. And the copy is not the best, but this is what is the record. And it states in writing, on the far, if you turn it sideways, on the far right-hand side, euro bonus, and there's a symbol for euro, $7,100. And that's executed by Mr. Monaghan. That's the only written evidence, admissible written evidence, on the issue. So at summary judgment, they were not able to create a triable issue that anything other than 7,100 euro is what was owed to Mr. Monaghan. There is nothing to rebut this document that meets standards of admissibility. Okay. That's your position. Any further questions from your honors? Thank you. Thank you. What specific relief are you seeking, Mr. Purcell? Your Honor, what we are seeking is that the court find that the district court erred in denying the Rule 50 motion and reversing that. And, you know, our request is that the court grant a new trial. But if, in the alternative, we would request that the court find that there is no support in evidence for the damage claim that appears to be related to the multiplier. I know I only have a few seconds left. I wanted to address just one point that Mr. Heffelfinger made, which is that he has correctly stated that it is our obligation to show that there was error. But it is under the Ninth Circuit law, as Obrey v. Johnson cites the Haddad v. Lockheed Corporation case, it says the reviewing court must find prejudice unless it concludes that the verdict is more probably than not untainted by error. And I think, you know, as we discussed, particularly as it relates to the jury's award of damages that appear to be related to a multiplier for a claim that was only related to past due wages, we believe that there is error. And I do not believe that the appellee has met his burden to show that it is more probable than not that there was no prejudice to telecom retaliation. So what should we do so far as you're concerned? Your Honor, I believe that the court should find that the district court erred in denying the Rule 50 motion, both in trial and after trial. And at minimum, we believe that the issues related to the multiplier have to be, and the damages that appear to result from that would have to be either retried or there should be instructions that the jury cannot consider the multiplier as part of its damage calculation. Thank you, Your Honor. Thank you. I thank both counsel for your arguments. They were helpful in a complicated case. That concludes our argument calendar for the day, and we're adjourned.
judges: Farris, Clifton, Bea